and United States of America. Mr. Murray for Petitioner COMPTEL, Mr. Gallardo for Petitioner California Public Utilities Commission, Ms. Sundaresan for the Respondent, Ms. Cooper for Petitioner California Public Utilities Commission, and Mr. Gallardo for Petitioner California Public Utilities Commission. Our challenge is limited to the Commission's grant of nationwide forbearance from avoided cost resale under Section 251C4 for time-division multiplexing lines, or TDM, purchased by government and business customers. Would you please explain something for me? Yes, sir. What is the relationship between TDM, which I'm not sure I thoroughly understand, and copper wires, copper loops? TDM is delivered over copper loops, Your Honor. And the distinct... What is TDM? It's a business type of line that's used, but it's a DSO line. It's the same line that goes to your home. It's a line. Yes. It's a physical line. It's a copper loop that goes to the house, and it's lined up... But as I read the brief, it doesn't have to be copper. No, Your Honor. It can be offered over fiber, but the difference is that the fiber is not line-powered. So if your voice service goes out in an electrical outage, you have no voice service. No, I understood that. I understood that. So TDM is a method of transmission, and copper wires are a medium of that transmission, not a method. That's correct, Your Honor. And the record showed there are 28 million of these line-powered copper lines that government and business customers are purchasing. And we compete with ILEX for those 28 million lines. Half of our customers are located in rural areas where the line-powered copper TDM is the only available voice service. And they include local post offices, schools, libraries, first responders, and myriad others where there's no internet broadband and there's no VoIP. Where VoIP is generally available to the other half of our customers, they too purchase line-powered copper lines in addition to VoIP because of that distinctive line-powered feature. And those TDM lines, those line-powered lines, Your Honor, are three to four times more expensive than VoIP. Well, don't say TDM lines because you're talking only about copper, aren't you? I'm talking about the line-powered copper, so I'll try to refer to it that way. Please don't use TDM then because it's going to confuse me because that includes both copper and fiber. Yes. I will use line-powered copper, Your Honor. And the customers that buy that line copper, in addition to VoIP, there's hundreds of thousands of these customers. And they range from federal and state agencies to banks and retail chains. And they demand them to ensure critical communications, especially given increasingly severe climatic events and blackouts such as in California. In many cases, these line-powered copper loops are mandated by law. For example, they're required for time synchronization of the National Airspace System and as a fail-safe for prescription drug fulfillment by pharmacies and even for daycare centers. Counsel, may I show you my simple-minded approach to this case? Isn't it fair to say that the legacy LECs are going, are diminishing in their role in the market rapidly? In certain areas, they are, Your Honor. There's certain... Let's talk nationally. Yes. I've looked at statistics and there is a dramatic decline in their position in the market as different modes have come in. That's correct, Your Honor. But where they still maintain a local monopoly is over these line, these copper line-powered loops to business establishments and government agencies. Well, yes. That's like saying after the automobile came into existence, there is a company that built carriages, horse carriages that still had a monopoly. Well, Your Honor, just because something is old doesn't mean it's not useful. And there are large parts of rural America where the line-powered copper loop is the only voice service that's available. Are these non-price cap companies? No. These include price cap companies. And indeed, Your Honor... Most of them are non-price cap, right? No. That's not the case, Your Honor. And in the record, we show that half of our customers are in rural areas served by price cap LECs. That's why we are able to compete with them using the avoided cost statute. It gives us the opportunity to go in and offer a competitive alternative. And we are the only alternative in those areas. But go back to my point. Nationally, the LECs are dropping like flies. Their business has dropped in the last, what, five years from 80% to down to 37%. They're all the other intermodal or other modal groups are killing them, right? Yes. But what those other intermodal groups cannot offer, Your Honor, is the line-powered feature of copper loops. And Your Honor, the ILACs have not retired those loops, and they haven't retired them because there's still a very persistent and strong demand. 28 million of these lines are still being sold, and we're competing vigorously for them. And we are the only competitive alternative for those lines, Your Honor. Now, the FCC may want to start drawing different lines. But if you go back to their avoided cost resale orders, in the Terry case, for example, it was one single exchange serving 605 households. In the Omaha order, it was 24 wire centers in the Omaha MSA. So the number is not necessarily this positive here, even though it's a very nationwide, strong, persistent demand for these line-powered copper loops. And what this commission did- But isn't it diminishing? No, no. The record showed that the demand for these line-powered copper loops is persistent. And in fact, with recent climatic events and the rolling blackouts you're seeing in California, they may become even more valuable. But never before this order, Your Honor, has the commission looked at the retirement of these copper loops as having anything to do with what they claim is the purpose for the forbearance, which is to promote next-generation deployment. And that theory, Your Honor, counters 20 years of FCC precedent, starting with the local competition order in 96, all the way through to a 2015 order involving U.S. telecom petition, where the commission has said the top-down pricing methodology of avoided cost resale imposes none of the costs or burdens that would- It's neutral as to whether or not it has any effect on facilities-based deployment. This decision turns that on its head, and it does so without acknowledging it. And Your Honor, the- Well, I thought the order did acknowledge it was going to force the CLECs to develop their own facilities and be more effective competitors. Yes. But Your Honor, first of all, it's not economically feasible, and Congress did not intend in the 96 Act for CLECs to be replicating legacy copper loops when it's wasteful. But secondly, even if we deploy fiber, even if we deploy our own facilities for next-generation networks, those- there's no technology today that has the line-powered feature of the copper loop. As I said earlier, it may be old, but it's still very useful. And as long as that market persists, the commission has in the past recognized that there's an importance of having a competitive alternative for that service. And we have been the only competitive alternative, and the only way we've been able to do that is through avoided cost resale. I see my- But you know- Counsel. Excuse me. It's okay. Go ahead. No, go ahead. No, no. David, go ahead. Sorry. Why don't you finish? I didn't mean to interrupt you, Larry. Go ahead and finish your question. I didn't mean to interrupt you. So let me make sure- I have a question that's very similar to Judge Silberman's question, and I just want to make sure I understand this. Isn't it true line-powered copper loops will remain available, correct? Yes. It's a question- There's two- we'll go ahead and finish. Yeah. As you say, the commission knows, I think it's in footnote 51 or 52, that there's- that ILEX can retire the copper loops, but they haven't. Yeah, but they haven't done that yet. That's correct. As long as they don't, they remain available. So I have two questions about that. Number one, so what you're concerned is really about then is price, correct? Correct. That's what this is all about. The commission says, well, price is not a concern because, you know, there's always 201 and 202 to ensure prices are reasonable, and we think, you know, facilities-based alternatives will keep the prices down, right? That's the argument. So what's wrong with that argument? Well, in the areas where the ILEX have the line-powered copper loops and there is no FCC 2018 second wireline order issued the year before this order, the commission rejected suggestions that broadband VOIP is a substitute for line-powered copper loops, precisely because there's large rural areas in the country that don't have broadband, they don't have access to VOIP. And Judge Tatel, on the same day that this order was issued, the commission launched an initiative, a multibillion-dollar 10-year initiative to try to bring more deployment of fiber and broadband into rural areas of the country, and some of that money is going to U.S. telecom members like Verizon, like Frontier, like Consolidated, and that is because they are serving areas where our customers exist, where these loops are solely in their control, and the only means that we have to discipline price is through the ability to get avoided cost resale. And we get that either through invoking the discount itself or, as Congress intended under 252A1, to do it through negotiated wholesale agreements. But we only get those agreements if that backstop of avoided cost resale is in place. And, Your Honor, we put into the record that, and this was a November 2018 submission, that when the ILECs filed their petition, they stopped negotiating with our petitioners for avoided recost contracts. And as a consequence of that, and they've continued to not negotiate with us through the six-month transition period, and because these contracts are typically only two or three years, we're out of – they're either expired or they're about to sunset. And then – Counsel, if I may – Now, you mentioned – this is the last part of this. All right. Well, just the last question. In your opening comments and in your brief, you mentioned the risk to – of the forbearance to the air traffic control system. Yes. Could you – so are there air traffic control facilities in areas of the country where there is no broadband? There are. And also, Your Honor, it's mandated by federal law that these copper loops be maintained as fail-safes for time synchronization of the national airspace. Well, did the FAA complain? Did they file comments on this rulemaking? I don't recall, Your Honor. I mean, we have been vigorously – I mean, I – look, I thought to myself when I read your brief, well, if there's a risk to air traffic control, one would expect the FAA to have raised its concerns with the FCC, but I couldn't find it. Well, I think, Your Honor, the difference here is it's not that the lines won't still be available to them, but they will now have only one option for purchasing those lines, and that'll be – Well, that's my point. That's my point. Wouldn't the FAA have worried about that? Wouldn't that have been of concern to the FAA? Well, they are a customer, Your Honor, of our clients, and we have been representing their interests both before the FCC and now in this appeal. Counsel, may I follow up on Judge Tatel's question? If I understand your concern, is the possibility that copper wires, which are diminishing in use, but they're still in existence, will be increased in price to you? That's your objection, isn't it? Well, they'll be increased to the point where we can no longer compete, Your Honor, because the critical price – and this was what the FCC noted in its Omaha order, that the 251B1 general resale option is not an adequate protection because the only way that SELEX can compete for these copper loops is on the basis of price. And without a wholesale discount, you can't do that. So, it will drive our petitioners out of business. Why should we care whether the price is increased to you? Isn't the concern that underlines the original statute as it's been implemented over the years? The concern is competitiveness vis-a-vis consumers. And the more fiber and voiceover develops as a technique, the LECs are having a decreasing percentage of the market. They're weaker and weaker and weaker. Why should we care? Why should there be any relevance to the fact that you may have to pay more for copper wire access? Well, Your Honor, I think the reason you should care is because, while the FCC has been given broad discretion under the Section 10 factors for forbearance, the one thing that this court has said in the Verizon v. FCC 2009 order, and I believe earlier, and I think even the decision in which you were involved, Your Honor, and may have written the opinion, the one thing they can't do is change – deviate from their past decisions without explanation. And in this case, Your Honor, up until this order, the Commission has looked at each market. It has looked at avoided cost resale. It has looked at the top-down pricing of avoided cost resale. And it has said it doesn't come back. Is that basically your geographical market power argument? It's not just that, Your Honor. You will not find anywhere in this order a discussion of the top-down pricing of avoided cost resale. They lump avoided cost resale and UNEs into the same analysis. And that's a critical distinction because the pricing methodology for those two requirements are fundamentally different. You're going far and removed. Let me put this. I'm sorry. I read – I'm trying to read your brief carefully. What is your core legal argument? What is your core – Our core – Everything kitchen sink in your brief, which is well-written, but it's everything in the kitchen sink. What is your core legal argument? Our core legal argument, Your Honor, is that for the last 20 years, the Commission has recognized that avoided cost resale does not impose the types of costs on ILECs that have any influence on their decisions to deploy next-generation networks. In this decision, for the first time, the FCC has said that avoided cost resale does affect the incentives of ILECs and whether or not they will deploy next-generation networks. And there's no explanation for that. And the reason in the past, Your Honor, that the FCC has said, if this doesn't affect facilities-based deployment, is because of the pricing methodology. It's fundamentally different from the cost-based deployment pricing for UNIs. No discussion of that in this order. I'm sorry. I understood the focus of the FCC's decision to be inducing the CLECs to go into more advanced facility-based transmission mechanisms. And we are doing that, Your Honor. No, no, no, stop for a second. It isn't fair to say that the thrust of the order will push the CLECs into their own facility-based operations, which of course would fiber and other voiceover. I can assure you, Your Honor, that CLECs are going into facilities-based competition. The one thing they're not doing, they're not going out and replicating copper loops that were deployed decades ago. The costs were recovered decades ago. It's not efficient. And so the question becomes, from the customer perspective and from the competitive perspective, which is what Congress cared about under the 96 Act, if we eliminate avoided-cost resale, are we leaving markets where there is only one game in town, the ILEC? And that is what this order does. It restores local monopoly conditions for these services in large swaths of the country. And isn't really this a fight between what is predicted down the line, where we would really have to defer to the FCC because predictions are laden with policy concerns very difficult for courts to challenge agencies with respect to their predictions. But predictions have- They're predicting the decline of copper loops. They may be predicting it, Your Honor, but there's nothing in the record to support that prediction. And there is contrary evidence that these 28 million copper loops have not been retired. There's nothing stopping the ILECs from retiring them. They're not going to retire them because there's still this very significant demand by these business and government customers. And if anything, this forbearance order is going to reduce the incentive for ILECs to retire those copper lines. And that is record evidence that the commission overlooked, disregarded, but whatever, you won't find it in the order. Okay. If there's no questions at this time, we'll just make sure there's not. And then we will hear from you a bit on rebuttal, Mr. Murray. Thank you. Mr. Gallardo. Thank you. Good morning, Your Honors. May it please the court, I am Enrique Gallardo, representing Petitioner California Public Authorities Commission. I'll discuss several ways in which the FCC was arbitrary and capricious in approving forbearance. For the incumbent local change carrier obligations to unbundle their network elements and to offer services at avoided costs. And to the first point regarding public safety, Your Honors, as we speak, much of the Western United States is on fire. This year, California wildfires have destroyed many more acres than in any other year in history. And we're not even done with the fire season. Other states face increasing challenges from hurricanes, storms, and other climate-related emergencies. The resiliency of communications during such emergencies is only going to grow in importance. First responder agencies depend on the resiliency of line-powered time-vision multiplexing service delivered over copper loops. Obtained through the unbundling obligation to maintain communications during emergencies. Moreover, the 911 call-in system in many regions currently depends on these network elements obtained through the unbundling obligation. Excuse me, counsel. Did I not see in the record some indication that the California authorities were no longer of the view that copper wire would be that important? No, Your Honor. That was not in the record. That was in the respondent's briefs, or it might have been the intervener's briefs, but not in the record. And of course, we should view this case on the record. But that was not in the record. That was in the brief. Thank you, Your Honor. So, counsel, let me just ask you a question. I thought your brief on this point was quite powerful. I'm going to ask the commission some questions about it. But let's assume we agreed with you that the commission's response in its order, as opposed to its brief, on this public safety question was inadequate and it has to go back. What is your position going to be on the land? I mean, as I understand it, TDM copper will remain available for public safety agencies, correct? In some cases, yes. Well, where won't it? It's required, right? There's no indication at this point that it won't be available everywhere in the country, is there? It's hard to say, Your Honor. I mean, the ILACs are free to switch from copper, to retire to copper. Okay, but at this point, they haven't, right? So, in this record, they haven't done that. They're offering copper TDM. And as long as they offer it, they have to offer it, right? So, the same question I asked, is this basically a concern about price? Is that what it is? I think it's also a concern about availability. There's concern that it may not be. Explain, just explain that to me, would you please? Well, the unbundling obligation requires dialects to make this available. Without that obligation, I don't believe there's anything that would ultimately require this to be available. Whether, just to be clear on this point, whether it's available or not, is not a byproduct of this order. There's going to be independent decisions that determine whether it's available or not. There may be legal requirements that remain available. But this order itself goes to the market, goes to the price, right? It doesn't, it's not directly impacting availability. It impacts availability in the sense that there's no obligation to offer this service without the unbundling obligation, I believe. Wait a minute, counsel. I think both my colleagues are pointing out that there's a separate order that sets forth the conditions whereby LECs can abandon copper wires, right? Yes, your honor. And there's nothing in this order, or any order, that requires LECs to maintain copper wires? No, correct, your honor. So, I think we're all puzzled as to why you think this order is the order that reduces the availability of copper wires. Well, again, as I mentioned, it does reduce availability in terms of eliminating the obligation to offer these disks, to unbundle the elements. Wait, now you just, now you completely confused me. Because I thought you said that, I thought you agreed with Judge Silberman's point that there isn't anything that requires it, and that this requires the provision of TDM copper, and that this order doesn't deal with that issue. This order simply deals with eliminating the unbundling requirement, not the provision of TDM copper itself. Right? Yes, your honor. What am I missing? Yes, your honor. We're saying the unbundling obligation is the means by which customers, government customers, business customers that rely on the resiliency of time, of line-powered copper lines, that's the medium by which they get this CERP. So, I understand what you're saying is that the lines, whether they exist or not, is another issue. But this issue is whether or not the incoming carriers are obligated to offer the service, and the elimination of the service. This gets back to both of my colleagues saying this is just an issue of price. Price and availability. I mean, yes, just to be clear, when you say availability, you're talking about availability of unbundled service, not availability of copper. I mean, in other words, as I understand the situation, whether copper is available or not, and I'm just using copper loosely, I'm sure that I'm getting the actual particulars wrong, but I think everybody understands what I'm getting at, that the availability of copper is settled by something else. What you're talking about is whether there's an unbundled availability, and yeah, that's affected by this order. But there's only an unbundled availability of copper if there's an availability of copper to begin with. That is, that's governed by something else outside this case. Yes, your honor, yes, that is true. Okay. I just want to make sure, your position is also, I think, as I read your brief, that the orders, as you call it, one sentence response to this whole concern was simply not responsive, correct? That it didn't even deal with price, right? Well, the order did not address public safety at all. There was one sentence that might have tangentially touched on issues of 911 service, but on wider issues of public safety, many issues of public safety that were raised by parties, that just simply did not provide any response. And that is, last year in the Mozilla Corporation versus FCC case, this court clearly stated that public safety was a fundamental responsibility of FCC, and FCC must address the impact of its orders on public safety, and FCC did not do this here. So we believe that's arbitrary. Judge Silverman, Judge Taylor, do you have further questions for Mr. Gallardo? No, I don't. No. Thank you, Mr. Gallardo. We'll give you a little bit of rebuttal time, too. Sure. Ms. Sundaresan. Good morning, and may it please the court. My name is Silas Sundaresan, and I represent the Federal Communications Commission and the United States. The issue before this court is whether the commission could you counsel, I'm sorry, but your time is limited. Could you pick up right away on this public safety question? Wait a minute. Wait a minute. I just lost everything. Pardon me? Judge Silverman, we can still hear you, and now we see you. You're still there. Okay. I don't know what you don't have. That's because, Larry, your problem is you don't have line power copper you're using. Oh, I think as soon as counsel started to talk, I lost my picture. We've got you back. It's her fault. All right. I was just asking counsel if she could just begin with the issue we just finished on with California and this question of public safety. Yes, Your Honor. Their argument, yeah, let me just say, their argument is that the commission just had one sentence in its entire order on this issue and that it wasn't responsive. It mentioned only 911 service. It wasn't responsive to any of their other concerns. And as they point out, the commission in its brief says that it didn't have to do more because the public safety comments were redundant of other comments that the commission had considered. And as they point out, that's not an acceptable response after our decision a few years ago in Missoula. That's their argument. Your Honor, the commission, the CPC's central public safety argument is that line power, TDM over copper is essential for government customers and public safety agencies. That is the availability of line power. And the line power argument was addressed by the commission in paragraph 32 of the order. And the commission was not convinced by that argument because it found that businesses that rely on continuously powered communications routinely purchase backup power. And as this court hit on with our opposing counsel, this order that the availability of line power is tied to the existence of copper. And incumbents increasingly are retiring their copper loop. And this order has nothing to do with that. That is a business decision that the carriers are increasingly making in response to dwindling customer demand for TDM over copper. And so the line powered argument, yes, petitioners can claim that their customers want line power. But the market has dramatically shifted over the last 25 years. And as customers are increasingly gravitating. You're relying on which paragraph? Is it 32? Yes, Your Honor. And I just want to make sure I'm looking at the right place. Is that J277? I believe that's correct, Your Honor. So that's talking about the distinctive line power feature of TDM voice service. And it's making the point that it's available. But it doesn't deal with public safety as such, right? It doesn't deal with public safety by terms. And so then it seems like the question would be, well, even if there is a bare availability, there could still be a public safety implication from the order. And the argument is, well, under Mozilla, you may well be able to establish that the public safety is accounted for. I'm not suggesting that you can't account for that. But I'm just talking about the four corners of the order itself. It needs to treat with the question and deal with it. Your Honor, the reason that there is not a standalone public safety analysis in the order, because this order has nothing to do with the availability of TDM service, which will continue so long as incumbents have not retired their copper loop. TDM over copper will continue to remain available. This order, as the judges had hit on earlier, is about ending regulated pricing to the analog loops and resale. And CPUC does not challenge the pricing as it relates to the commission's grant of forbearance from these requirements. So nothing in this order is ending the availability of the TDM service itself. As the record confirms, several incumbents have filed comments with the agency saying that they have strong business incentives to continue to offer TDM to those customers who want it. This order simply ends the pricing aspect. Counselor, I'm looking at, I think I'm looking at Julia Panik's 401, 402, California's comments. They're raising concerns about 911 network availability and cost. They specifically mentioned cost. My recollection of their actual brief is that they're not challenging the pricing. We're talking about their comments. I'm talking about their comments before the commission. Your Honor, the commission did say in the order that there is no difference in the reliability between VOIP 911 service versus legacy 911 service. And in any event, as we explained in our brief- But isn't that, that's inherently, that's just, that makes no sense to me in terms of reliability. I mean, the commission itself acknowledges that for VOIP and other non-copper wire services, you need either battery or generator backup. And so the reliability question turns completely on the adequacy of that backup, doesn't it? It is driven in part by the backup, yes. But CPUC's argument- Well, not in part, completely. It's not, it's not in part, it's completely. I mean, that's what the line power issue is all about. I mean, you know, I'm, I'm, I'm participating in this argument here today in rural Virginia. And I'm on, we're on the, we're using an internet-based service. But it's, we're getting a storm here in a few minutes. And if my power goes out, I'm going to have to switch to the telephone. And how long I could stay on this depends on what kind of generator backup I have. So they're not separate. They're very integral to each other. It just doesn't make sense to me that the commission could say that the services are equally reliable. That can't be right. Your Honor, that is, that argument is supported by the fact that California is currently in the process of transitioning their legacy 911 system to an IP-based 911 system in order to enhance public safety, not undermine it. The leading state agency in California that is overseeing emergency preparedness has said that an IP-based 911 system is in fact more reliable, has less power issues, and has more monitoring capabilities than the existing legacy 911 system. And it's not just California. 30 plus states around the country are also following suit. So the trend is very clear that, you know, CPUC's argument that a TDM over copper is essential for 911 is directly contradicted by what California is currently doing. And CPUC doesn't challenge the accuracy. Counsel, excuse me. That's the point I made earlier. The response was, although that's in the brief, it's not in the order. Your Honor, we did speak about the facilities-based or voice-based 911 being similar in terms of reliability as the legacy-based 911 that is in the order. With respect to our argument in the brief, we raised that to essentially impeach CPUC's claim that California is so reliant on legacy TDM for their 911 system. That is absolutely not true. That is contradicted by what California is doing right at this moment. In fact, they have since targeted March 2021, only six months away, as the date in which they plan to complete the implementation of IP-based 911 infrastructure throughout the state of California. So California is not in the infancy stages of transitioning to an IP-based 911 system. It is almost near completion. So I thought that was a very important point. As a matter of it, one of the things that's interesting about the FCC is you keep referring to regulations as orders. When under APA, of course, an order is an adjudication. Chenery, which is relied on constantly by the parties and by the petitioners in this case, really has a different kind of meaning in regulation than it does in adjudication. So you're only required in regulation to respond to the most important questions. Not to every question. And you can respond in your brief to issues that are more or less significant. Was this issue, do you think, a particularly significant point or one that you can respond to in your brief to attack the argument made by petitioners? Yes, we are permitted to respond to it in our brief because we were essentially impeaching CPUC's claim. They are contending that the legacy TDM is so essential for 911, and that is contradicted by what the state is doing right at this moment. That's a very powerful point. Why wasn't it in the order? Or did you not have to have it in the order? The commission didn't, the commission did talk about the VoIP 911 and legacy 911 as being very similar. We also addressed the line power argument in paragraph 32 in footnote 116. You did say that everybody was moving to fiber away from copper, including for 911. That's right, your honor. Our larger point is that the market has changed dramatically. The reasons why these mandates were enacted a quarter century ago was to jumpstart competition in the local telephone market. That purpose has now been achieved. Competition in this market is flourishing. Customers are not interested in TDM over copper. I'm sort of struck by the fact that the LECs look like the weak sisters in the market now, partly the monopolists. Yes, that's true, your honor. They're being killed by various other competitors in the market that weren't even visualized in 1996. That's exactly right. Today in the voice services market, there are cable providers, over-the-top providers, wireless providers, CLECs, incumbents. Customers have access to any number of options, which will help discipline rates. The fact of the matter is that these regulations were enacted to promote competition, which has been achieved at this point. These mandates were never intended to exist in perpetuity. We know this because Congress gave the commission the authority to forbear from these regulations once they were no longer needed. This order is not even taking away the availability of the TDM. I can't emphasize that enough. The record confirms that incumbents are committed to providing TDM for those customers who want it. We also said in footnote 124 of the order that we expect that carriers serving government customers will make sufficient arrangements to ensure that those customers are continuing to receive service. This order simply ends the regulated pricing. Counsel, you have to let me interrupt. That's part of the rules of appellate advocacy. I'm sorry, your honor. There is one, it seems to me, one weakness in your case. You argue, and the order argues, that if they didn't forbear on these regulations, both regulations, both the top-down wholesale and the, what do we call it, UNE? Analog loop. Yeah, the continuing loop or the sale of the loop. That if you didn't forbear, that the LECs would be trapped in having to continue to operate copper loops. That's clearly wrong, isn't it? And footnote 52 in your order acknowledges it. That's phonier than a $4 bill. Your honor, it is true that the incumbents can retire their copper loop. That's a decision they make and not the commission. How are they trapped by the existing regulations? When, as we pointed out in our dialogue earlier, nothing stops the LECs from retiring their copper loop. So why are they trapped? So the way they are, I'm not sure the word they use, trapped, but the reason that we said that in the order. That was your word. That was in your order. Your honor, if it was in the order, then I misspoke. The reason why the incumbents are in the position that they are is because while it is true that they can retire their copper loops, they don't do so on a customer by customer or line by line basis. They do it in a given geographic area. And if they have existing business customers, and the petitioners are talking about business customers here. We're not talking about residential customers. Those business customers, the incumbents have multi-year contracts with those customers. And of course, business customers tend to produce or purchase larger volumes of service. So the incumbents are simply not going to just retire the copper loop and risk disrupting those customers' operations. So the incumbent will, of course, do everything they can to transition those customers to IP-based voice services. But until that happens, they are still maintaining the cost of the copper. And as long as they have the copper, the CLECs can then continue to lease the analog loops at highly discounted rates and to purchase the telecommunications services through avoided cost resale at a highly discounted wholesale price. Counselor, that doesn't mean that the LECs are trapped in any way. They can go out of the copper wire business anytime they want. Your Honor, the commission also found that these regulations created a... Counselor, isn't that true? Your Honor... Yes or no? Yes or no? Isn't it true that you're not at all trapped by the continuation of the regulation? The LECs can go out of the copper wire business anytime they want. There's a separate regulation on that. Yes, they can retire their copper loops and lose those customers. Of course, they don't want to do that. Well, the claim was the existing regulation before forbearance trapped them. And I think that's baloney. Isn't it true? Your Honor, you are correct that the incumbents can retire their copper loops when they want to. The commission also pointed out, though, that these legacy regulations prolong the dependence on these legacy networks. And that the reason for that is because the CLECs... Wait a minute. Not on the part of the LECs. On the part of the CLECs, Your Honor. So the competitive... I can understand the arguments with CLECs. I can understand the argument that the agency puts forward. We want to push the CLECs into the modern world to be more effective competitors. I don't understand, and I think it's fallacious, is the point you make in the regulation that the LECs are trapped by the existing rules. Because nothing traps them. They can go out of the copper wire business anytime they want. They can retire their copper loops when they want to. My explanation is that... So do you concede that footnote 52 eliminates the contention in the body that the LECs are trapped in some kind of way by the existing regulations? Your Honor, the... Would you concede that count? We would concede that that's a stronger argument, is that the CLECs are having a... They are less incentivized to deploy their own facilities. Would you concede that that's a baloney statement in the order? We concede that the incumbents are not precluded from retiring their copper and can transition to fiber. Yeah. Therefore, if the FCC used the statement that the LECs are trapped by the existing regulations, that was false. Your Honor, the reason we said that is just because as long as they do maintain their copper... And it's not a process that is instantaneous, right? You know what I call this argument you're trying to make? If my aunt had wheels, she'd be a trolley car. Did you ever hear that? That's too bold. I can't say that I have, Your Honor, but we certainly concede that the incumbents can retire their copper loop, but the... I concede that they're not trapped. They're not trapped. Thank you. I'm sorry. When you write a long order like this on regulation, you can make a mistake which isn't necessarily fatal. But it's important at oral argument to acknowledge when you make a mistake. Yes, Your Honor. Excuse me, David. Go ahead. You're older than I am. I beg your pardon. Does David have a question? So yeah, I have a question. It's related to... It relates to the cost question and specifically to the commission's 10A1 response on reasonable prices. So the commission gave two reasons why it thinks forbearance will not result in unreasonable prices. One was, you know, 201 and 202, the other provisions are still in statute. That's one. And number two, that facilities-based competition will continue to discipline prices, right? That's its answer to that, right? Yes. So I have two questions. So first of all, on the 201 and 202 point, if the commission can satisfy 10A1 by simply pointing to the existence of 201 and 202, why did Congress bother putting 10A1 into the statute? In other words, if 201 and 202 are adequate, why did Congress require the commission to affirmatively find that forbearance will not result in unreasonable rates? I think perhaps it's an additional statutory measure to ensure that rates remain just and reasonable. Well, the Congress knows that 201 and 202 are in there, right? Right. They know that. But yet it required the commission to make this affirmative finding. And so therefore, I have to find where that finding is. And the only thing I can find is the argument that facilities-based services will discipline the market, right? That's what it is, correct? Yes, Your Honor. Okay. And the problem with that, isn't Quest-Phoenix the problem with that? Because as the petitioner points out, in Quest-Phoenix, the commission expressly found that forbearance from UNA loops will not encourage the deployment of next-generation services. It's just the opposite of this. Your Honor, it is true that... I'm sorry. So let me just finish. Let me just crystallize my question, okay? So my question is to sum up is, as I understand the statute, relying on 201 and 202 isn't enough. It has to be, as you said yourself, an affirmative finding that will not, forbearance will not result. And the affirmative finding that the commission has made seems inconsistent with Quest-Phoenix, which isn't explained in the order. You do talk about it in the brief, but not in the order. Your Honor, yes, Your Honor. So five years after Quest-Phoenix in the 2015 U.S. telecom forbearance order, the commission actually explicitly said that these legacy regulations, in fact, decrease investments in next-generation facilities. That is a far more recent decision than the Quest-Phoenix order. In any event, this court has disavowed the notion that legacy regulations somehow increase investments in next-generation facilities. In USTA-1, back in 2002, this court said that legacy regulations deter investments in next-generation facilities because it limits the resources that the incumbents have to invest in next-generation services. And it decreases the incentives for the SELEX to invest in next-generation services because it's much more financially advantageous for them to simply rely on the discounted rates that they receive. I get all that, but where do I find any of this that you're now giving me in the order? The order did not explicitly acknowledge that finding in Quest-Phoenix. Yeah, I think you need to delete the word explicit. It didn't acknowledge it, did it? The order didn't acknowledge the Quest-Phoenix finding. The commission did make the larger point that the market has changed dramatically, customers have switched to IP-based services, that the commission, under Section 706 of the Act, is encouraged to promote advanced telecommunications deployment, and that these are IP-based services. Counsel, wasn't Quest-Phoenix a request for forbearance in a specific market in Phoenix? That's exactly... Whereas this rule that you've called an order, as a former administrative law professor, I bridle at calling a regulation an order. But in any event, in this rule, you're dealing with nationwide rather than individual geographical markets. And you've said in, was it the Link case, Lincoln, that you're not bound to the analysis of market power when you're dealing with these cases? And market power, as everybody uses the term, refers to local markets, not the national market, right? That's exactly right, Your Honor. But the distinction you want to draw, I think, in response to my colleague, is that Phoenix was strictly a local question. That's right, Your Honor. In Quest-Phoenix, Quest was seeking forbearance from the regulation as applied to one market, Phoenix, Arizona. Here, in contrast, U.S. Telecom is seeking forbearance from the regulations for price cap carriers nationwide. And this court, in the EarthLink decision, said that under Section... That's the case that we're trying to remember. Yes. Yes, Your Honor. So under Section 10 of the Act, as this court recognized in EarthLink, there is no particular analytical framework that the commission is wedded to. The commission has the discretion to apply a variety of frameworks. Here, we appropriately considered whether these mandates would promote investments in next-generation facilities, because as we found that the market has changed dramatically, and customers are overwhelmingly asking for IP-based voice services, the commission wanted to ensure that providers would be encouraged to deploy next-generation fiber networks to meet this growing demand, and found that these legacy regulations, in fact, impeded the investment in next-generation facilities. Now, Granite claims their particular business model is jeopardized, because what they do is act as an intermediary, sort of bundling together different services from different LECs, and selling them at a discount to ultimate big business consumers. And your answer to that is, so what? There's nothing that provides in the statute an obligation to protect your business model. Isn't that correct? That's exactly right, Judge Silberman. As you had pointed out earlier, Section 10 of the Act is about protecting consumers, the public interest, and competition in general. It's not about protecting individual competitors and their business models. As this Court found in USTA 2, even if all CLECs are driven from the market, as long as there is robust intermodal competition from other providers, there's nothing in the Act that prohibits that result. But in any event, the CLECs are not going to be driven from the market, because as the Commission explained, the majority of CLECs are not even relying on these legacy regulations to provide service. They're overwhelmingly providing service through commercial agreements, and that includes Encompass's own members, Granite and Metcal. If you look at page 59 of our brief, for that confidential information, you'll see that avoided cost resale constitutes an extremely small percentage of these resellers' business models. They are relying instead on... Yes, but they are... Of course, your opponents argue that that regulation provides a backstop, which influences commercial agreements. Yes, but these avoided cost resale was not created to create a backstop for individual competitors. It was created to promote competition, which is now flourishing in this market nationwide. That's a good answer. Thank you, Your Honor. If my colleagues have no further questions for you, Ms. Anderson, we'll hear from Ms. Cooper now. Thank you. Thank you. Thank you, Your Honor, and may it please the Court. I'd like to pick up with the public safety issues that were addressed earlier today. And what I'd really like to make clear is that nothing about U.S. telecom petition or the forbearance granted here could affect public safety, and that's why it isn't addressed at any length in the order. The order has nothing to do with the rules for retiring copper or for discontinuing TDM, and the public safety harms that are alleged to come from those events and those actions aren't germane to this order. In addition, U.S. telecom explicitly withdrew its request for forbearance regarding 911 databases. The services that governments purchased to receive 911 calls were never within the petition at all because they've never been subject to those obligations. 251C3 has never required incumbents to unbundle the facilities that connect their networks to the 911 call answering centers, and the tariff service of routing those calls has never been subject to C4. In addition, the FCC has also repeatedly concluded that 911 calling does not require copper based services, and so petitioners' arguments to the contrary are really in the teeth of years and years of FCC orders that have addressed these potential harms and, you know, rejected the premise of their argument. In addition, I know my friend at the FCC mentioned that paragraph 32 of the order addresses the line power issue. That is one of the cruxes of the arguments that CPUC makes about the importance of the availability of TDM provided over copper to government customers. The order also does address in paragraph 33 the issue of government customers that will continue to depend on TDM service, and there the commission stated, which is at JA278, that marketplace demand is likely to lead providers to meet the needs of customers in connection with technology transitions. Really, all this order is doing is saying that incumbents no longer have to offer these services or leave these facilities at low regulated rates, but where it's economically feasible and sensible for incumbent LECs to offer these services, they absolutely will do so. They have an interest in keeping these customers. Again, as has been discussed today, there's extensive intermodal competition in the marketplace that disciplines end user prices. Isn't that your key point? The LECs are dropping like flies in terms of the market force they have, and therefore the notion that they should in any way subsidize the competitive LECs makes no sense when the market is full of competitors that are actually causing the LECs to drop their market share rapidly. Yes, that's correct, Your Honor. The incumbent LECs, as was shown in the record and the order emphasized, are now an ever competitive marketplace. Right now, under the obligations at issue, we're forced to create systems and maintain systems to handle unbundling and resale that wouldn't exist but for those obligations. That really puts a thumb on the competitive scale against us, so our more nimble new entrant competitors are able to better compete because we have these one-sided obligations that no other competitors are obligated to pay for. Thank you, Judge Taylor. Judge Solderman, if you have no further questions for... No, no questions. Thanks. Thank you, Ms. Cooper. Mr. Murray, we'll give you two minutes for rebuttal. Thank you, Your Honor. Real quickly, in the 2005 U.S. telecom order, that was a request for nationwide forbearance, and the commission denied forbearance from avoided cost resale. In paragraph 60, it emphasized that the top-down pricing methodology effectively caps the prices that ILEX can charge for wholesale voice services, and, quote, we agree with U.S. telecom that it preserves the flexibility to provide voice services to customers without building their own network facilities. And in the second wireline order in 2018, the commission rejected ILEX suggestions that VOIP is an adequate substitute for TDM or copper lines. I'm sorry. I didn't know what you said. In the second wireline order in 2018, a year before this order, the commission rejected ILEX suggestions that VOIP is an adequate substitute for copper loops, especially since VOIP is not even available in many rural areas of the country served by ILEX. And here's what the key ruling there was. That forbearance would not promote competitive market conditions because it would eliminate any service alternatives. Your Honor, there is a robust, significant, and continuing demand for these line-powered copper loops by government and business customers. They are consumers. Sorry. I don't think that's crucial. What's crucial is whether there's enormous competition in the marketplace. Why should the LECs be hampered in any way when they're a declining share? They're no longer the monopolist. Two reasons, Your Honor. Two reasons, Your Honor. Number one, the commission for 20 years has said that the top-down pricing of avoided cost resale does not hamper incompetent ILEX. It has no effect on their incentives. Of course it does. I'm sorry? Of course it does. No, that's the commission. You mean to tell me that the LECs are utterly indifferent to the regulations requiring top-down wholesale? They could charge higher prices. Why should they have an arm around their back? Why should their arms be tied around the back when they're weakening rapidly? Well, that's my second point, Your Honor. They're not weakening rapidly where they are the sole possessor of the line-powered copper loops used to provide these critical services. And the commission has found that in the Quest order, for example, Your Honor, Quest got 90% of its retail rate, and that was because it avoided the marketing and the billing and it's not a cost that is radically different from the top-down pricing. Doesn't that go back to your argument of it has to be done geographic by geographic? No, not at all. The 2015 order was a nationwide request, and the commission looked at it on a nationwide basis. So, Your Honor, the question is, this is the crux of the issue. The commission has, up until now, looked at whether or not there is a demand for a service, whether the incumbent LECs have monopoly control over the facilities necessary for that service and there are no adequate substitutes, whether the only form of competition available is avoided-cost resale. And in each of those instances, for 20 years, the commission has kept avoided-cost resale and forbore from U&E. How can you say they have monopoly control when they're down to 37%? Well, Your Honor, we're looking at two different things. The market that we care about and that this order ignored was this significant 28 million lines that the ILECs have not retired. They could. They haven't because they don't want to. These are customers that we're competing for with them, and they are the only ones who have these copper loops. And it is not economically feasible for us to replicate them. And, Your Honor, you know Congress, when it enacted the 96 Act, did not want entities to come in and wastefully replicate legacy facilities. It was about promoting next-generation networks. And on this issue, avoided-cost resale, this commission for 20 years has said avoided-cost resale has no effect on incentives to deploy next-generation networks. And that is not even discussed in this order. You will not find the top-down pricing methodology of avoided-cost resale anywhere. It certainly has an impact in encouraging the CLECs to be facilities-based. Not for copper loops, Your Honor. No, no. Not for copper loops. It's for alternatives. And we are. We are building alternatives. No, but this will induce, this clearly will induce the CLECs to move more rapidly into more advanced techniques. There's nothing in the record to support that, Your Honor, and I would say it won't. Because if you go back and look at the Omaha order, one of the things that the commission recognized, I'm sorry, the Omaha regulation, the commission recognized that allowing avoided-cost resale creates incentives. We can compete with that even where we have not yet built out our own facilities and next-generation networks. And that's a good thing. It provides an alternative. This order is going to restore local monopoly conditions for these 28 million copper loop lines. Okay. Thank you, Mr. Murray. If my colleagues don't have any further questions, we'll give Mr. Gallardo his rebuttal time, two minutes. Thank you, Your Honor. Contending on this discussion about competition, that just in its order places great emphasis on the role of facilities-based competition, not just competition, but facilities-based competition. Now, the California Public Utilities Commission presented evidence in the record that in California, most of the non-cable CLECs, as well as the four large mobile providers, relied on the infrastructure of just one incumbent. So, at least in California, there is not facilities-based competition in the voice market, despite the presence of voice alternatives. And other state agencies presented similar situations in their states as well. And the FCC did not address this evidence in its order. I'd like to address some of the discussion the FCC's counsel presented about California's view of the transition of 911 service. Currently, as we speak, the next generation 911 system in California relies on both PDM and voice over internet protocol service. I would question some of her characterization of California's view of 911 service. But I guess the bottom line is, because this is not in the record, we can't properly consider this evidence. Or this information I'm sharing just today. It's not in the record, and we can't properly consider it. And finally, I would point out that the FCC relies greatly on a fundamental factual finding that maintaining incumbent carrier unbundling obligations deters investment in advanced services. Now, this is contradictory to a previous factual finding where the FCC found the opposite. The FCC never discusses this previous factual finding in this order. Does not even acknowledge this previous factual finding. And this also is arbitrary. Sometimes you refer to factual findings as if they were historical facts when they're really predictions. Yes, Your Honor. They're predictions of what would happen. The FCC made one prediction previously, and then it contradicts its prediction here, and it doesn't address. Wouldn't you expect an agency dealing with rapid movement of technology to make mistakes in predictions and to rectify them in future predictions? You're not talking about historical facts. You're talking about predictions. Yes, Your Honor. But the agency should acknowledge the previous prediction and explain why it's changing its prediction now. Well, is it not sufficient? Is it not sufficient? What counsel told us in an argument today that Quest Phoenix was a local market issue, and this is a nationwide case. In terms of your objection, suppose they just said that in the order. Would you be complaining about it? Well, I'd have to see what they said in the order and if it properly considered that previous prediction. Now, in terms of the difference between a local market and a nationwide, I think that's more along the lines of what forbearance test you want to use. But in terms of this prediction of what the obligations will have effect on investment and advanced services, I don't see that that distinction matters as much. You mean whether it's local or nationwide? Exactly. Yes, Your Honor. And if it does, then I would like to see that explanation in the order. Thank you, counsel. It was my colleagues have further questions. We'll thank all counsel for their arguments this morning, and we'll take this case under submission.
judges: Srinivasan, Tatel, Silberman